IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,589

STATE OF KANSAS,
*Appellee*,

v.

GIOSBEL PEREZ-MEDINA,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a criminal defendant makes his or her position on lesser included crime instructions clear at an instructions conference with the trial judge, thus giving the judge an opportunity to avoid or correct alleged instruction error, the defendant has preserved the instruction issue for later appeal, even if no defense objection is lodged when the instructions are read or given to the jury.

2.

Aggravated battery, as defined in K.S.A. 2014 Supp. 21-5413(b)(2)(A) or (B), qualifies as a legally appropriate lesser included offense of aggravated battery, as defined in K.S.A. 2014 Supp. 21-5413(b)(1)(A). The lesser offenses require a reckless culpable mental state while the greater offense requires a knowing culpable mental state.

3.

Even if error in refusing to instruct on reckless aggravated battery offenses is assumed in this case, it is not reversible. No evidence supported a reckless act by the defendant.

1

4.

Because the defendant in this case provides no evidence or argument to establish the punitive effects of registration under the Kansas Offender Registration Act, K.S.A. 2018 Supp. 22-4901 et seq., he must register as a violent offender.

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 20, 2017. Appeal from Ford District Court; E. LEIGH HOOD and VAN Z. HAMPTON, judges. Opinion filed September 6, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Heather Cessna*, of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Kathleen Neff*, assistant county attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

PER CURIAM: Defendant Giosbel Perez-Medina was convicted by a jury of aggravated battery for knowingly causing great bodily harm or disfigurement to Ivan Valcarcel-Arias by using a knife to cut Valcarcel-Arias' face. This case requires us to rule on the propriety of jury instructions on lesser included offenses based on a reckless rather than a knowing state of mind and on the sentencing judge's imposition of a registration requirement under the Kansas Offender Registration Act (KORA), K.S.A. 2018 Supp. 22-4901 et seq.

We ultimately reject Perez-Medina's arguments, and we affirm his conviction and registration requirement.

## FACTUAL AND PROCEDURAL BACKGROUND

Perez-Medina and his wife, Yusimi Cabeza, hosted a gathering of friends and acquaintances at their home. The group included several women and four men: Perez-Medina, Valcarcel-Arias, Rowver Abreau, and Orlando Pedroso.

Valcarcel-Arias had not been invited to the party but stopped by to speak to Perez-Medina. The men were not present when Valcarcel-Arias first arrived, and Cabeza told him Perez-Medina would return in about 10 minutes. After the men returned to the house, all four of them left the party together to get beer and ice.

When they returned, all of the men other than Perez-Medina stood outside drinking beer and eating pork ribs, while the women were inside cooking. Perez-Medina spent time with both the men and the women.

The party ended abruptly when Valcarcel-Arias received a deep knife cut to his cheek. At the time, Abreau was sitting on the porch rail; Perez-Medina was standing next to him; and Valcarcel-Arias was standing at the foot of the stairs. Pedroso was standing near the porch as well.

The manner in which Valcarcel-Arias was cut would be disputed at Perez-Medina's trial.

Valcarcel-Arias alleged that Perez-Medina grabbed him from behind and then cut his cheek. Several witnesses would later testify at trial that the two men had a friendly relationship and that there was no ongoing dispute or precipitating argument between them.

3

After Valcarcel-Arias was cut, Cabeza came outside. She and Abreau helped Perez-Medina, who was highly intoxicated, back into the house. Perez-Medina was holding a knife with blood on it and was bleeding from cuts on his own hands.

Valcarcel-Arias drove to Maribel Rodriguez' house so that she could go with him to the hospital. On the way to the hospital, the two stopped at a police station to report the incident. The cut on Valcarcel-Arias' face required about 12 stiches to close.

Dodge City police officers went to Perez-Medina's home to investigate. They found drops of blood on the front steps and around the front porch. Cabeza told a detective where she had hidden a knife, which led the police to recover a "blue in color knife with a silver handle on ends, like a pocket knife." Officers arrested Perez-Medina; one officer would later testify about Perez-Medina's extreme intoxication and resulting unavailability for immediate interview by law enforcement.

The State charged Perez-Medina with the aggravated battery of Valcarcel-Arias under K.S.A. 2014 Supp. 21-5413(b)(1)(A), which forbids knowingly causing great bodily harm or disfigurement to another person.

Before trial, the State submitted a set of proposed jury instructions. In addition to an instruction on the charged crime, the State included instructions for several lesser included crimes, including two types of reckless aggravated battery.

In the State's case-in-chief, Cabeza testified that when the group of men returned from getting beer and ice, Perez-Medina showed her a gift he had received. The "gift" was the knife police would eventually recover from the house. Cabeza did not know what Perez-Medina did with the knife when he went outside.

4

On cross-examination, Cabeza claimed that Valcarcel-Arias had told her "he had found out that . . . there was a party, and . . . was going to stay there because he so pleased." Cabeza did not ask him to leave; after talking to Valcarcel-Arias, she merely left him waiting outside the house. She "didn't want to discuss" his appearance without an invitation and "didn't want to tell him anything." She said that he expressed his intention to stay at the party "in a bad way."

Cabeza also testified that on the day of the party Valcarcel-Arias had a knife and Abreau had two knives. She did not know what had happened to Valcarcel-Arias' knife. Abreau's two knives were hidden in her home.

Rodriguez testified that she and Valcarcel-Arias were involved in a relationship, and she was unaware of any ongoing dispute between Valcarcel-Arias and Perez-Medina. After being cut, Valcarcel-Arias called her and said that he wanted her to go to the hospital with him "because [Perez-Medina] cut my face." At first, Rodriguez thought he was joking, but when he arrived he was covering his bleeding face. She said it looked like Valcarcel-Arias' face "had been separated, his cheek." Valcarcel-Arias told her "[h]e was surprised that [Perez-Medina] would do something like that to him."

During Abreau's testimony, the prosecutor showed him the knife that police had recovered from Perez-Medina's house. According to Abreau, "[t]hat was the knife of the problem." He claimed not to know who owned the knife, although he conceded that Perez-Medina had possession of it at the time Valcarcel-Arias was cut. When asked specifically whether Perez-Medina took "that knife and cut [Valcarcel-Arias'] face," Abreau shrugged his shoulders and said, "Yes." But he testified he had not seen the wound being inflicted and only knew what had happened because he saw Valcarcel-Arias' face bleeding. Abreau also testified that he never heard Perez-Medina and Valcarcel-Arias arguing; there were not "any hard words or anger between" them.

5

Valcarcel-Arias' testimony ended the State's case-in-chief and opened the defense case.

While testifying for the State, Valcarcel-Arias described his relationship with Perez-Medina and Cabeza as a friendship. He said that there were no disagreements and that, as far as he knew, neither Perez-Medina nor Cabeza had a problem with him or had criticized him or his behavior.

Valcarcel-Arias admitted that he had not been invited to the party but said that Cabeza told him "to go ahead and wait [for the men to return], that it was only going to take 10 minutes." He did not feel unwelcome. According to Valcarcel-Arias, he was eventually expressly invited to stay and told to call Rodriguez and invite her as well.

According to Valcarcel-Arias, 10 to 15 minutes after the ribs were served Perez-Medina cut him. He said Perez-Medina attacked him from the back and cut his face. He had not seen a knife before he was cut. Valcarcel-Arias said he asked, "'What have you done? What have [you] done?' And, then, that's when Rowver [Abreau] and Orlando [Pedroso] intervened, and they take him inside the house." Valcarcel-Arias further testified: "When he grabs me, and I feel the cut, I try to make defensive move to get away . . . . It's not that he let go of me. He was standing close to the other two men. He was still holding the knife, and then he was talking. I don't know what he said, but he was there."

Valcarcel-Arias also testified that he had not seen Perez-Medina receive the knife as a gift from Pedroso earlier in the day. He denied being upset that Pedroso had never thrown a party for him and given him a gift.

6

When Valcarcel-Arias was recalled to the witness stand by the defense, he was asked a series of questions designed to be answered yes or no. He denied acting inappropriately toward Cabeza, denied arguing with Perez-Medina, denied disparaging Perez-Medina, denied holding a knife and threatening to cut Perez-Medina, and denied that Perez-Medina had cut his hands while trying to defend himself from Valcarcel-Arias. During the State's following cross-examination, Valcarcel-Arias testified that none of the men other than Perez-Medina had a knife.

During the defense case, Cabeza also was recalled. She testified that Abreau had tried to hide two knives in her bedroom on the night of the incident. She found the knives a couple of days later but did not tell anyone about them until she disclosed them earlier on the day of her trial testimony. She also explained that Perez-Medina had a preexisting disability that made it difficult for him to grasp anything firmly in his right hand. Because of this disability, Perez-Medina had cut meat, for example, with his left hand. This testimony evidently was intended to undercut the State's theory that Perez-Medina was holding the knife in his right hand when he reached around from the back of Valcarcel-Arias and cut his face.

Abreau also testified again in the defense case. He said that he had been involved in a knife fight with Valcarcel-Arias and Perez-Medina on the day of the incident. Abreau was shown the two knives that Cabeza had found in her house and brought to counsel's and the court's attention earlier that day. Abreau said that the knives were his and that he had hid them in Perez-Medina and Cabeza's bedroom on the day of the incident.

After the parties rested and the jury was escorted from the courtroom, Judge Van Z. Hampton discussed the jury instructions with counsel. He already had a draft of instructions prepared earlier by his trial court colleague, Judge E. Leigh Hood, who had

7

originally been assigned the case. This draft included the instructions the State had proposed.

Judge Hampton questioned "whether it is appropriate to include in the lesser included instruction, the aggravated battery with reckless cause of bodily harm or great bodily harm." The judge did not distinguish between the two types of reckless aggravated battery, K.S.A. 2014 Supp. 21-5413(b)(2)(A), which prohibits recklessly causing great bodily harm or disfigurement; or K.S.A. 2014 Supp. 21-5413(b)(2)(B), which prohibits recklessly causing bodily harm with a deadly weapon or in a manner that could have caused great bodily harm. He focused only on whether there was evidence to support Perez-Medina's reckless culpable mental state.

The prosecution argued against inclusion of instructions on reckless aggravated battery: "Reckless behavior is conduct that is so outside the normal bounds of caution, as to make it almost inevitable that harm will be done to someone. It's often called wanton disregard . . . . This was a deliberate act. It was pointed towards one person, and the injury was inflicted from behind without warning."

Perez-Medina's counsel argued that reckless instructions were warranted. The defense pointed to the evidence of Perez-Medina's "extreme inebriation," which, when combined with handling of a sharp object, "would in and of itself be reckless behavior." Judge Hampton asked whether the defense theory necessarily elevated the culpability in issue to knowingly rather than recklessly. Counsel responded that Perez-Medina "didn't know this was going to result from any cuts or injuries. However, he was conscious of the fact that it could."

8

The judge disagreed:

"The only direct evidence we have of the action of the Defendant were that he took the knife and ran it across the victim's face. And, I don't know how that could be considered a reckless act. Reckless would be where you're swinging the knife around close to someone, and they come in contact with it."

Defense counsel responded by pointing out the cuts to Perez-Medina's hands, arguing that it was not clear where those cuts came from, and the "jury could . . . infer there might have been some other swinging motions of the knife rather than this one sole cut to the alleged victim. Other cuts were involved. They had to have been inflicted some way."

After lengthy discussion, Judge Hampton decided against giving any recklessness-based lesser included crime instructions because "the evidence does not justify a finding of reckless actions, but only knowing actions." He instructed the jury on the charged crime of aggravated battery by knowingly causing great bodily harm or disfigurement under K.S.A. 2014 Supp. 21-5413(b)(1)(A). He also gave lesser included crime instructions on other "knowing" offenses:  first, aggravated battery by "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted" under K.S.A. 2014 Supp. 21-5413(b)(1)(B) and, second, battery by "knowingly . . . causing bodily harm" under K.S.A. 2014 Supp. 21-5413(a)(1).

The jury found Perez-Medina guilty as charged.

At sentencing, Judge Hood presided. He sentenced Perez-Medina to 41 months' imprisonment and 36 months' postrelease supervision. He also said that his "review of the

record and the evidence in this case show[ed] that a deadly weapon was used, being a knife" and therefore informed Perez-Medina that he would be subject to registration requirements under KORA.

Perez-Medina appealed to the Court of Appeals, raising four issues. Among them were his arguments that he should have received jury instructions on reckless aggravated battery and that imposition of an offender registration requirement based on a deadly weapon factual finding made by the judge rather than a jury violated his rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). See *State v. Perez-Medina*, No. 114,589, 2017 WL 262025, at *1 (Kan. App. 2017) (unpublished opinion). The panel affirmed the district court's judgment. 2017 WL 262025, at *6.

On the way to that result, the panel applied a clear error standard of review to Perez-Medina's challenge to the omission of reckless aggravated battery instructions.

> "Here, Perez-Medina argued for a lesser included offense instruction of reckless aggravated battery at the jury trial. The State argues that because he made no contemporaneous objection to the district court's refusal to give the recklessness instructions, we must find the district court's failure to give them was clearly erroneous in order for Perez-Medina to succeed. This is supported in [*State v. Fisher*, 304 Kan. 242, 373 P.3d 781 (2016)], where the defendant failed to object to the omission of an instruction. While this does not deprive us of jurisdiction to consider this issue, it does mean Perez-Medina faces a higher burden in persuading us that any error merits a reversal. 304 Kan. at 257. We must find that the failure to give the recklessness instructions amounted to clear error in order for Perez-Medina to succeed because he did not object to the omission of the instructions. See 304 Kan. at 257." *Perez-Medina*, 2017 WL 262025, at *3.

The panel concluded the instruction was legally appropriate but was not factually appropriate.

"Here, the evidence showed that Perez-Medina grabbed Valcarcel[-Arias] and cut the right side of his face with a knife. Perez-Medina was very intoxicated when he cut Valcarcel[-Arias]. Based on the definitions set out under K.S.A. 2015 Supp. 21-5202, this was not a gross deviation from the standard of care, but a knowing action taken by Perez-Medina to cause the result of cutting Valcarcel[-Arias'] face. As the district court stated, a reckless action would be swinging the knife around close to Valcarcel[-Arias], and then Valcarcel[-Arias] coming into contact with the knife. That would be a gross deviation from the standard of care from how a reasonable person would behave. See K.S.A. 2015 Supp. 21-5202(j). However, this was an instance where Perez-Medina knowingly grabbed Valcarcel[-Arias] and cut his face, regardless of whether he was intoxicated." 2017 WL 262025, at *3.

Perez-Medina advanced all four of his Court of Appeals claims in his petition for review, but we granted his petition on only two: whether it was error for Judge Hampton to refuse to give reckless aggravated battery instructions and whether the imposition of the KORA registration obligation required a jury finding on the use of a deadly weapon.

INSTRUCTIONS ON LESSER INCLUDED RECKLESS AGGRAVATED BATTERY OFFENSES

An appellate court performs a four-step review of challenges to jury instructions:

"""(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and

11

degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012).

"""Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant."

"'We examine "jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury. [Citations omitted.]"'" *State v. Pulliam*, 308 Kan. 1354, 1361-62, 430 P.3d 39 (2018).

Perez-Medina challenges Judge Hampton's decision not to instruct his jury on either of the two types of reckless aggravated battery. See K.S.A. 2014 Supp. 21-5413(b)(2)(A) ("recklessly causing great bodily harm to another person or disfigurement of another person"); K.S.A. 2014 Supp. 21-5413(b)(2)(B) ("recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted"). For simplicity's sake, because these challenges concern only whether there was evidence of the culpable mental state of recklessness that both types share, we will refer generically to reckless aggravated battery as requiring only a showing of recklessly causing harm. See *State v. O'Rear*, 293 Kan. 892, 896, 270 P.3d 1127 (2012) (under statute, defendant's culpability "defined in two ways: [1] by the defendant's mental state and [2] by the type of physical contact or the nature of the bodily harm that results").

The Court of Appeals panel, as set out above, concluded that Perez-Medina had not adequately preserved these challenges for appeal and thus faced a clear error standard on review. See *Perez-Medina*, 2017 WL 262025, at *3 (citing *State v. Fisher*, 304 Kan. 242, 257, 373 P.3d 781 [2016]). Perez-Medina contests application of this standard in his

12

petition for review, given defense counsel's "extensive argument that immediately preceded [the reading of the jury instructions]." We thus address application of the clear error standard first.

Under K.S.A. 2018 Supp. 22-3414(3), an instruction error must qualify as "clear" to merit reversal if a party has failed to object in the district court, "stating distinctly the matter to which the party objects and the grounds of the objections." Cf. K.S.A. 60-404 (verdict shall not be set aside by erroneous admission of evidence unless timely objection "so stated as to make clear the specific ground of objection"). Interpreting the K.S.A. 2018 Supp. 22-3414(3) language, this court has held that "[t]wo requests during trial for instructions defining recklessness and setting out elements of recklessness-based lesser included offenses of aggravated battery were sufficient to preserve the issue for appellate review." *State v. Gatlin*, 292 Kan. 372, Syl. ¶ 1, 253 P.3d 357 (2011). Further, when argument on instructions had been entertained and ruled upon by the district judge, "[i]t was not necessary for [the defendant] to repeat what had become a fruitless exercise [by objecting] three more times in order to preserve the issue for appellate review. [The defendant] had made his position clear to the district judge and given him ample opportunity to rule correctly." 292 Kan. at 376.

As in *Gatlin*, Perez-Medina made his position on the necessity of reckless aggravated battery instructions clear to Judge Hampton, and the judge had ample opportunity to address the parties' arguments and rule correctly. The only distinction between this case and *Gatlin* is that here it was the judge who initiated discussion of recklessness, rather than the defense. Still, the critical goal of the contemporaneous objection rule was met. See *State v. Boyd*, 257 Kan. 82, 89, 891 P.2d 358 (1995) (generally timely objection necessary to give trial court opportunity to correct any alleged errors). Requiring Perez-Medina to have objected again when counsel had just explained

13

to Judge Hampton why the instructions should be given would have been "fruitless." Thus the clear error standard does not apply in this case.

The next question of whether the instructions were legally appropriate is easily answered. An instruction on a lesser included crime of the charged crime is a legally appropriate instruction. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). "And a lesser included crime includes a 'lesser degree of the same crime.' K.S.A. 2017 Supp. 21-5109(b)(1)." *Pulliam*, 308 Kan. at 1362. The parties do not dispute that reckless aggravated battery under either K.S.A. 2014 Supp. 21-5413(b)(2)(A) or (B) is a lesser degree of knowing aggravated battery under K.S.A. 2014 Supp. 21-5413(b)(1)(A). Both of the instructions Perez-Medina sought here were legally appropriate.

The question of whether the instructions were factually appropriate, as recognized by Judge Hampton, is thornier. We have held that a lesser included crime instruction "is only required 'where there is some evidence which would reasonably justify a conviction of some lesser included crime.'" 295 Kan. at 161 (quoting K.S.A. 22-3414[3]); see also *State v. Soto*, 301 Kan. 969, 987-88, 349 P.3d 1256 (2015) (discussing *State v. Haberlein*, 296 Kan. 195, 203-04, 290 P.3d 640 [2012]; instruction on lesser included crime required when facts to support commission of lesser included crime presented at trial). A majority of this court has previously agreed that this analysis "is closely akin to the sufficiency of the evidence review," where the standard is "'whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" 295 Kan. at 162. But see *State v. Williams*, 308 Kan. 1439, 1463, 430 P.3d 448 (2018) (Rosen, J., concurring) (questioning propriety of applying sufficiency test to lesser included crime instructions, suggesting that there must be some evidence that would "'*reasonably justify*'" conviction of lesser offense). Further, when a defendant has

14

requested an instruction on a lesser included crime, "the evidence should be viewed in the light most favorable to the defendant." 295 Kan. at 162.

As stated, reckless aggravated battery under (b)(2)(A) is "recklessly causing great bodily harm to another person or disfigurement of another person." Reckless aggravated battery under (b)(2)(B) does not alter the required culpable mental state; it remains recklessness. It does alter the necessary degree of harm actually caused; instead of requiring "great bodily harm" or disfigurement, it merely requires "bodily harm" done either with a deadly weapon or "in any manner" that could have caused great bodily harm, disfigurement, or death.

In their briefs to the Court of Appeals and in the defense petition for review and the State's supplemental brief to this court, the parties argued only about preservation and whether the evidence in this case was adequate to require reckless aggravated battery instructions under the sufficiency-like standard this court has been applying. But, before oral argument to this court, the defense submitted a letter of additional authority under Supreme Court Rule 6.09 (2019 Kan. S. Ct. R. 39), drawing our attention to K.S.A. 2018 Supp. 21-5202(c), the part of an overall 2011 recodification of Kansas' criminal statutes that deals with culpable mental states. At oral argument, members of this court quizzed both counsel on the potential effect of that statutory subsection, and we turn to it before analyzing the evidence before the jury in this case.

Since recodification, the Legislature has explicitly defined the "reckless" culpable mental state in the following way:

"A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will

15

follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2018 Supp. 21-5202(j).

The Legislature also has explicitly defined the culpable mental states of "intentionally" and "knowingly," saying: "A person acts 'intentionally' . . . with respect to . . . a result of such person's conduct when it is such person's conscious objective or desire to . . . cause the result." K.S.A. 2018 Supp. 21-5202(h). "A person acts 'knowingly' . . . with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 2018 Supp. 21-5202(i).

And the Legislature has classified the culpable mental states "according to relative degrees, from highest to lowest, as follows: (1) Intentionally; (2) knowingly; [and] (3) recklessly." K.S.A. 2018 Supp. 21-5202(b).

Finally, under K.S.A. 2018 Supp. 21-5202(c),

"[p]roof of a higher degree of culpability than *that charged* constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts knowingly or intentionally. If acting knowingly suffices to establish an element, that element also is established if a person acts intentionally." (Emphasis added.)

Perez-Medina argues that the plain language of K.S.A. 2018 Supp. 21-5202 means that the State's proof of his knowing aggravated battery of Valcarcel-Arias necessarily implies that the State also proved his reckless aggravated battery. If this is so, Perez-Medina's counsel reasons, the lesser included reckless aggravated battery instructions were factually appropriate and refusal to give them was error. The State, on the other hand, urges this court to focus on the "that charged" language of the first sentence of the statutory subsection. It interprets or construes that language setting up proof of one

16

culpable mental state as proof of another, lower one to operate as a one-way ratchet in its favor: The State can employ it when it needs absolution for proof that has deviated from that called for by the charging document; the defense cannot employ it to demand lesser included crime instructions regardless of the actual culpable mental state evidence presented before the fact-finder. In short, this statutory subsection has no effect on whether the defense can demonstrate the existence of error on the issue before us in this case.

One Court of Appeals panel has sided with the State on the meaning and import of K.S.A. 2018 Supp. 21-5202(c), rejecting the idea that evidence satisfying a "knowingly" culpable mental state automatically satisfies a "recklessly" culpable mental state in all instances. See *State v. Green*, 55 Kan. App. 2d 595, 613, 419 P.3d 83 (2018). The panel restricted application of the statutory subsection as the State suggests we should, limiting its use to proof of the charged crime. To apply the statutory subsection to lesser included offenses, the panel said, "would tend to cause any lesser included offense with a lower culpable mental state than the crime charged to become factually appropriate regardless of whether the facts or the evidence support the applicable mental state and despite the differences in the culpable mental state definitions." 55 Kan. App. 2d at 614; see also *O'Rear*, 293 Kan. at 904 (Luckert, J., dissenting) (noting incentive for defendant charged with reckless crime to admit then mutually exclusive intentional action).

We need not firmly and finally settle the meaning and breadth of application of K.S.A. 2018 Supp. 21-5202(c) today. Assuming without deciding that Judge Hampton's refusal to give the lesser included instructions on reckless aggravated battery was error because of the statute's language or otherwise, we cannot see our way to reversal under even a harmlessness standard more forgiving than clear error. See *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063, 1079 (2019) (harmlessness standard for preserved instructional error: court "'must be persuaded that there is no reasonable probability that

17

the error will or did affect the outcome of the trial'"). There simply is no evidence, even when the proof at trial is viewed in the light most favorable to the defense, that Perez-Medina recklessly caused Valcarcel-Arias' injury. Without such evidence, there is no chance that the giving of the reckless aggravated battery instructions would have made a difference.

Perez-Medina did not testify. The only bystander witness was Abreau, and he said that he saw the moments before the cutting and the moments after it but not the moment *of* it. The only evidence of what occurred in that moment came from the victim, Valcarcel-Arias. He testified that Perez-Medina grabbed him without warning from behind and reached around to cut him immediately. According to Valcarcel-Arias, there was no provocation—no prior argument or disagreement between himself and Perez-Medina. There was no ongoing fight in which the obviously intoxicated Perez-Medina was swinging a knife wildly or, at a minimum, indiscriminately.

The jury simply had no competing narrative of reckless action to consider. Defense counsel's effort to construct one through questions to Valcarcel-Arias was consistently resisted with denials. Of course, counsel's questions are not evidence in and of themselves. See *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). Further, to the extent that Cabeza had said that Valcarcel-Arias had been disrespectful or that Abreau had admitted hiding other knives in the house, as Perez-Medina's appellate counsel has pointed out, an indispensable evidentiary link between those events and a reckless cutting was still missing. This is also true of the mentions of Perez-Medina's inebriation, his wounds, and his disability. A conclusion that Perez-Medina was reckless would have required inference stacking that we never permit, much less demand. See *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017) (inference stacking prohibited).

Perez-Medina is not entitled to a reversal of his aggravated battery conviction.

18

KORA REGISTRATION

Perez-Medina argues that Judge Hood's reliance on his use of a deadly weapon to support KORA registration constituted impermissible judicial fact-finding that increased punishment. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

This argument relies on caselaw predating this court's decision in *State v. Petersen-Beard*, 304 Kan. 192, 201-02, 205, 377 P.3d 1127, *cert. denied* 137 S. Ct. 226 (2016), in which a majority of the court held that KORA registration does not constitute punishment for sex offenders, and the majority's subsequent decisions that reached the same conclusion for KORA registration of violent offenders. See *State v. Huey*, 306 Kan. 1005, 1006, 399 P.3d 211 (2017), *cert. denied* 138 S. Ct. 2673 (2018).

"[T]he legislature's intent in enacting KORA was to create a nonpunitive civil regulatory scheme. . . . [T]o overcome that intent, only the 'clearest proof' concerning the effects of KORA on the class of drug or violent offenders [will] suffice." *State v. Watkins*, 306 Kan. 1093, 1095, 401 P.3d 607 (2017) (citing *State v. Meredith*, 306 Kan. 906, 907, 399 P.3d 859 [2017]). Perez-Medina does not provide any evidence or argument to establish the punitive effects of KORA registration that is any different from that previously rejected by this court. See *Meredith*, 306 Kan. at 912 ("any member of a non-sex offender class subject to KORA must demonstrate conclusively that the act as applied to a non-sex offender has a significantly different *effect—i.e.*, it is punitive").

One member of the court is not participating in today's decision. Three of the remaining members are still committed to the correctness of the *Petersen-Beard* and *Meredith* holdings that doom Perez-Medina's *Apprendi*-based argument. The other three

19

remaining members dissent on these points. The outcome against Perez-Medina on this issue is thus affirmed by an equally-divided court, and the registration requirement is upheld.

CONCLUSION

For the reasons outlined above, we affirm the Court of Appeals decision affirming Perez-Medina's conviction and sentence. The judgment of the district court also is affirmed.

NUSS, C.J., not participating.

* * *

JOHNSON, J., concurring in part and dissenting in part: I agree with the majority on its handling of the lesser included offenses, but I continue to vigorously dissent on the majority's wrong-headed and utterly ridiculous holding that mandatory Kansas Offender Registration Act (KORA) registration is not punishment for the criminal conviction that *must* precede it. The draconian and expensive requirements of registration and widespread publication of registrants' identities and personal data is sufficient for any reasonable person to discern the punitive effects of KORA. See *State v. Petersen-Beard*, 304 Kan. 192, 211-25, 377 P.3d 1127, *cert. denied* 137 S. Ct. 225 (2016) (Johnson, J., dissenting).

Here, the majority relies on *State v. Watkins*, 306 Kan. 1093, 1095, 401 P.3d 607 (2017), as authority. I joined the dissent in that case which cited the dissent in *State v. Meredith*, 306 Kan. 906, 914, 399 P.3d 859 (2017), to-wit:

20

"Kansas' requirement of offender registration—especially in its modern, maximally invasive, maximally pervasive, and infinitely more public incarnation—is punishment, certainly in effect if not in intent. It is no less so for a drug offender than for a sex offender or a violent offender. It is no less so when the Ex Post Facto Clause is before us than when *Apprendi* or the Eighth Amendment is before us."

Consequently, given that registration is unequivocally punishment in the real world where citizens reside, *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny, prohibit subjecting Perez-Medina to that requirement based upon judicial fact-finding, i.e., that he used a deadly weapon. I would vacate the registration requirement.

BEIER and ROSEN, JJ., join the foregoing concurring and dissenting opinion.